## W. J. WHITEHEAD v. J. L. NICKELSON ET AL.

1. FAMILY HOMESTEAD—EXEMPTION.—A family consisting of a widower, his daughter, and a female relative, is dissolved by the marriage of the daughter, and a homestead acquired by the widower at or after such dissolution of his family would not be exempt from forced sale.

2. SAME.—After such dissolution of his family, a widower cannot exempt his property from liability for his debts by voluntarily taking upon himself, for some temporary or indefinite period, the support or maintenance of persons having no legal claim upon him.

3. SAME.—Nor does the mere temporary and indefinite union of persons in one household, directing their attention to a common object, constitute a family so as to exempt a homestead.

4. SAME.—Nor will the hiring of servants, or the contributing to the support of persons permissively residing with a party, constitute a family.

APPEAL from Victoria.    Tried below before the Hon. T. C. Barden.

This was an action of trespass to try title, brought by Whitehead against Nickelson.

The property sued for is a half lot in the town of Victoria, with a brick building and several outhouses upon it.    It was

intended for a hotel, but no hotel has been kept there of late years. Nickelson acquired the property in 1849 or 1850, and has lived upon it ever since. He first erected a wooden building, in which he lived, with his wife and children and servants, and kept hotel himself until his wife died, in 1857. After that, the hotel was kept by others; but Nickelson and his only surviving child, and a servant-woman, formerly his slave, always resided there.

In 1861, the building was burned down, and in rebuilding, Nickelson borrowed money from Fenner, and gave him a deed of trust upon the property. In 1868, Fenner sold by virtue of this deed of trust, and Shry purchased the property for $600, less than its value. Nickelson refused to surrender possession, claiming that it was his homestead. After some negotiations, Shry agreed to reconvey for $1,000. Nickelson not being able otherwise to raise the money, applied, as guardian, to the Probate Court for authority to sell some vacant lots which he had given to his daughter some years before, and to invest the proceeds in this homestead property. Authority was granted. The lots sold for $900; Nickelson raised $100. The money was paid to Shry, and he conveyed title to the minor daughter, who was then living with her father on the premises, and continued to live there with him till her marriage, in March, 1872.

On the 8th of March, 1872, the day before her marriage, she and her intended husband executed a writing, which is not skillfully drawn, but which was, in intent and effect, a relinquishment and transfer of the daughter's interest in this property to her father, to take effect upon her marriage. The next day she was married. Some two weeks afterwards, (March 26,) she and her husband executed to Nickelson a conveyance for the property, reciting that they did it "in accordance with former signatures," referring to and confirming the writing of March 8.

In 1869, or early in 1870, and while Nickelson and his daughter, and "the freedwoman," who was old and sickly,

but who lived with Nickelson after emancipation, as before, were residing on the premises as a family, a Miss Moncrieff, of Georgia, the daughter of Nickelson's first cousin, wrote to him, and asked him whether she could have a home in his family, as her father was dead, and she no longer had any home in Georgia. She also asked permission to bring with her a little girl, a niece, some two years old. Nickelson consulted with his daughter, and she consenting, he wrote to Miss Moncrieff to come. She came, bringing with her the child, and both remained there till the fall of 1873, when she left, for the purpose of being married. Nickelson testified that she came there to be a member of his family, and to remain as long as he lived or she lived. The testimony in the case tends to show that she was there as a daughter would have been, working, managing, and superintending for the benefit of the family, while Nickelson supplied her, as he did his daughter, with shelter, medical attention, and part of her clothing.

April 15, 1872, Whitehead obtained a judgment against Nickelson, in the District Court of Victoria county, for $1,400. On this judgment, execution was issued 13th of May, 1872, under which the lot in controversy was sold on the first Tuesday in July, and Whitehead became the purchaser.

Upon these facts, verdict was returned, and judgment rendered for defendant; and Whitehead appealed.

*Philips, Lackey & Stayton,* for appellant.—It was contended, in the District Court, that the fact that the property had been the homestead of his family prior to the sale under the deed in trust to Fenner, affected the question as to whether or not the property was the homestead of the appellee at the time appellant bought at the sheriff's sale; and the court seems to have been of that opinion. The appellee, as he could legally do, parted with all his title in the property, when it was sold under the Fenner deed in trust, and Shry became the pur-

chaser; and if he had not, he would not now be heard to say that his daughter did not get perfect title when he bought the property as her guardian, for her, and did so under an order from the Probate Court, made at his request, and by which he was empowered to sell the property of his ward to raise money for that purpose.

With the loss of his title, all of his prior homestead rights, as did all his other rights therein, ceased to exist.

In the absence of title, there was nothing to support the homestead claim or right, and we are not aware that when the title to the property in which homestead rights have once existed is lost, that there still exists a slumbering dormant right, or capacity, which lives without something to feed upon, and which in case of a reacquirement of the title will reattach and support the homestead exemption, in the absence of the same surroundings which, under the law, were requisite in the first instance to create and maintain that right.

When the appellee reacquired the title, on the 26th of March, 1872, he stood, with reference to his right to the homestead exemption in this property, just as he would have stood if he had acquired by purchase a lot which had never before been his property; otherwise, the doctrine would be, "once a homestead always a homestead,"—and this without reference to continuous ownership in the same person, and without reference to the existence of a family, which is necessary in the first instance to create the exemption.

The Constitution protects that which is the homestead of the family at the time the creditor seeks to subject it to forced sale,—not that which may have been the homestead at some former time, by reason of the existence of facts which then made it, within the meaning of the law, the homestead of the family, but which have now ceased to exist. The Constitution, in exempting homesteads, humanely looks to the protection of families, and to that object alone.

It was contended, in the District Court, that notwithstanding the appellee had parted with all title in the property, and

consequently with all rights growing out of his former owner-ship, yet that the fact that he was a widower, and had once had a homestead in the property, entitled him to a homestead exemption therein, which a bachelor with the same surround-ings would not have been entitled to; that the fact that he had once had a wife and child, while he owned and occupied the property as a homestead, stamped upon him the full char-acter and all the elements of a family, and upon the property in question a homestead character from which it could not escape at any time, while he was the owner thereof,—and this notwithstanding he might sell and reacquire it ever so often.

Can the fact that the property in controversy possibly may have been the homestead of a family while it was owned by his daughter, relieve the appellee from the necessity of showing, by proof, that he was so surrounded after the mar-riage of the daughter as to constitute him, without reference to his daughter, the head, or at least a member, of such an assemblage of persons as the law recognizes as a family? We think not. If the property was exempt while it was owned by her, it was an exemption in her favor, and based upon her title, and not upon any dormant right existing in the appellee, from the fact that it had once been his property and homestead, and that she had been at one time a member of his family while it was thus exempted.

The daughter ceased to be a member of the family of which her father was a member the moment she married; and the act which made her a member of another family did not in-corporate him with the new family; nor could he claim any right from the existence of a family of which he was not a member. The daughter and her husband are not setting up any rights in the property; nor can they, for they have parted with their title.

Both title and such occupation as the law contemplates must concur and exist in the same person, or there cannot be any homestead exemption.

The residence of the daughter upon the property while she

owned it, even if her father did live with her during the time, cannot relieve him from the necessity of showing, that, after he acquired the property from his daughter, he had living with him such an assemblage of persons as, within the meaning of the law, constituted a family.

We are aware of the great difficulty of determining, by any fixed and well-defined rules and principles, what kind of an assemblage of persons living together will, within the meaning of the law exempting the homestead from forced sale, constitute a family, and in looking to decisions made in other States upon similar laws we derive but little assistance ; yet it is a matter which must be determined by a fixed rule or principle, however hard it may be to apply the rule to cases as they arise. It will not do to say that each case must stand or fall upon the facts, without reference to a fixed principle.

The leading idea in the Constitution, in reference to the homestead exemption, was doubtless to secure to such persons as constitute a family, in contradistinction to single persons, a home, and to foster and upbuild the family interests, upon which, mainly, society depends.

We cannot disassociate the idea of a family from the idea of an assemblage of persons among whom some are dependents, over whom some other one or more of their number have and legally exercise control.

And we submit, that to constitute a " family," within the meaning of the Constitution, there must be a state of dependence in law, if not in fact, upon the part of some of those who constitute the family, on some other member or members of the family whom the law designates as the head or heads of the family ; and this dependence may result as a matter of law from the relationship existing between the parties,—as between parent and minor child, husband and wife, guardian and ward, and master and slave; or it may result as a matter of fact, from the head of the family controlling the homestead property, in which the dependent has either

a present or prospective interest. (10 Allen, 425; 14 Ohio, 301; 41 Georgia, 154; 42 Id., 406; 46 Id., 232.)

And this state of dependence necessarily implies, upon the part of the person whom the law designates as the head of the family, not only a control of the dependent, or of the property in which the dependent has an interest, either present or prospective, but also implies a legal right to such control.

There must be a mutual obligation between the parties, which entitles the one to control, and which imposes upon the other the duty of submitting to that control; and there must not only be a dependence, but there must also be, upon the part of the head of the family, a corresponding obligation to provide for the wants of the dependent, let that obligation result from whatever fact it may.

We know of no case in which this court has sustained a claim to the homestead exemption, where the claim was not founded upon a family organization consisting of parents and children, parent and child, or husband and wife.

[Counsel discussed the facts at length.]

*Glass & Callender*, for appellee.

I. The writing of the 8th of March, 1872, although not drawn with legal skill, did release and transfer to Nickelson all his daughter's right and title, upon condition that the proposed marriage should take place; and when the marriage did occur, the condition was performed, and the right vested. (2 Blackst. Comm., 154.) But as the daughter was a minor, the writing of the 8th of March needed confirmation after her marriage had given her the status of a woman of full age; and the deed of the 26th of March was such a confirmation, and operated only as such. Nickelson's title, as derived from his daughter, dates, therefore, not from the 26th of March, but from the 9th, on which day it was vested in him, *eo instanti* and *ipso facto*, by her marriage.

While the daughter was a member of her father's family,

and the title was in her, the homestead of the family was protected the same as it would have been if the title had been in him. For, as was said by this court in Wilson *v.* Cochran, 31 Tex., 680, "If the property on which they [the family] are domiciled belongs to either, or to all, so living together, it equally comes within the purview of the constitutional guaranty, and is, in fact, a homestead, and cannot be subjected to forced sale. It is the homestead of a family, and not the head of the family simply, which is protected." When the daughter married, and passed out of the family, she left the title behind her, vested in her father by the very act by which she ceased to be a part of his family. And thus there never was an instant in which the title was not in some member of the family residing upon the premises.

II. But the controlling question in the case is,—Did the marriage of the daughter break up the family, so that there was no longer a family entitled to the homestead protection? We know, from the evidence, and from the facts the jury must have found as the basis of their verdict, that, according to the common understanding of language, the family was not broken up, but continued. For nearly or quite two years before the daughter's marriage, Nickelson and his daughter and Miss Moncrieff, with old "Aunt Sarah" as a dependent on Nickelson, and with generally a hired servant as a cook, had been living together as a family, in an ordinary family organization. And when the daughter married, there was no change in that family organization. It had one member less, but the family organization continued as before—Miss Moncrieff keeping house, and working and superintending for the family, not for wages, but as her contribution to the common benefit; "Aunt Sarah," living as a dependent; and Nickelson supplying food, medical attention, and other necessaries for all. And this family organization continued at the time of the sale, and long afterwards, and till old "Aunt Sarah" died, and till Miss Moncrieff left, in the fall of 1873, for the purpose of being married.

We think this was a family, within the meaning of the Constitution, as well after the daughter's marriage as before. It seems to come fully up to that meaning, as declared by this court in Wilson *v.* Cochran, where, speaking of the meaning of the term "family," as used in the Constitution, the court said: "It was most certainly used in its generic sense, embracing a household composed of parents and children, or other relatives, or domestics and servants; in short, every collective body of persons living together within the same curtilage, subsisting in common, directing their attention to a common object, the promotion of their mutual interests and social happiness."

The appellant insists, that, in order to constitute a family, some of the members must be dependent upon others who exercise a legal control over them. In a restricted sense, this may be true; for all who eat depend upon him who supplies the provisions, and the head of every family does or may exercise a general control over all its members, while they remain such members. But if it is meant that there must be such a dependence that the law would compel the head of a family to support the members, or such a control that the head can constrain the members to remain if they wish to sever the connection and depart, then we take issue, and say the law requires no such dependence or control to make a family entitled to the homestead protection. For there may be, for example, a family of a widow and adult children, yet the law will not compel her to support them, nor can she restrain them if they wish to leave her. In the case of Taylor *v.* Boulware, 17 Tex., 74, the family consisted of Boulware and his married niece and her husband, there being also on the place some slaves and hirelings. Here there was no such dependence or control as is contended for, unless it was between Boulware and his slaves. But the decision, which supported the homestead protection, in that case, was not put upon the ground that there were slaves there as part of the family. On the contrary, it was em-

phatically declared, that if Boulware "had been without servants, or any one with him, after the death of his wife, it would still have been his homestead so long as it continued to be his residence." (Id., 77.)

Homestead laws, we take it, were not made with reference to slaves, or for their benefit. They were themselves property, and never had any difficulty in finding owners and homes.

It seems to us, that the case of Taylor *v.* Boulware is decisive of the case at bar. The relationship between Boulware and his niece was not materially different from that between Nickelson and his cousin. The dependence and control in the case at bar are far greater than in the other; for that niece had a husband upon whom she legally depended, and to whose control she was subject, while Miss Moncrieff had no one but Nickelson to look to for support, and was subject to the control of no other.

Again, the appellant contends that the members of the family must be such as would inherit the homestead property. But this cannot be the law; for, as often happens, the homestead may be the separate property of the husband, while all the children of the family may be the children of the wife by a former husband, and have no heritable blood in relation to the head of the family. Or the husband may have but a life estate in the property, with remainder over to parties not connected with the family. In that case, his own children could not inherit; and yet it would be his homestead as long as he lived. The appellant argues, that the view of the law for which he contends is favored, if not established, by the provision of the Probate law which declares that property exempted from forced sale "does not form any part of the estate of a deceased person, where a constituent of the family survives."

Precisely what this clause means may not be very clear; and, so far as we are advised, it has not yet been judicially construed. But one thing is certain: it has no application to

a living man's homestead, and therefore no application to the case at bar.

It is argued, by appellant, that Nickelson, after his daughter was gone, was in no better condition to hold a homestead than a bachelor would have been. We do not so understand the law. We do not think its policy is to give a homestead protection to the young and vigorous man, surrounded by wife and children, and to turn out, homeless and shelterless, the old and infirm father who has lived long enough to bury his wife, and to see his children all married or dead. According to the doctrine of Taylor *v.* Boulware, and other cases, the law does continue the homestead protection to such surviving parent, although he may live solitary upon the premises. If he has the homestead right, is it shorn of any of its privileges or incidents? May he not, like any other holder of a homestead right, sell one home and buy another? Is he confined to the same roof, whatever may be the demands of his business, his health, or his comfort? We think not. And if he may sell one homestead and buy another, certainly he may, as Nickelson did, part with the title, and then regain it, especially where he regains it from his child at the instant that she passes out of the family. On this point, see Volger *v.* Montgomery, American Law Register for April, 1874, where it was held, by the Supreme Court of Missouri, that a conveyance and reconveyance of the homestead, while the head of the family remains in possession, does not affect the status of the property.

Besides, the whole evidence shows that Nickelson never intended to give up his homestead rights in the premises. Even when Shry held a deed from Fenner, he denied Shry's right to possession, for the reason that it was his homestead. With $900 of his daughter's funds and $100 of his own, he redeemed the property, and had a clear title again invested in one of the family; and it is evident that this was all done to secure and continue the homestead. And when the daughter is about to marry, she transfers her title to her

father for the same purpose—to continue in him the homestead right.

MOORE, ASSOCIATE JUSTICE.—It cannot be maintained, that the Constitution and laws exempt the homestead from forced sale, unless the defendant in execution was the constituent of a family occupying the premises as their homestead when he acquired title thereto; or unless it was thus occupied prior to its sale under execution. The fact that the premises at some previous time may have been the homestead of the family, and exempt from forced sale for the payment of the debts of the head of the family, if he afterwards parts with his title to it, will not operate to exempt it, if he reacquires it after the disruption of the family, whether the family has been dissolved by death or the voluntary severance of the family relation by the constituents of which it was composed. Nor will the fact that one of the members of the family acquired the title to the property after the head of the family, who is the defendant in execution, parted with it, and that it continued to be occupied as the homestead until the family was finally dissolved, nor the fact that immediately on the dissolution of the family its former head reacquired the title, exempt it from liability to sale for the payment of his debts.

Unquestionably, all of Nickelson's right or interest in the property in question in this suit was divested out of him by the sale under the deed of trust to Fenner. Although Nickelson continued to hold and claim the premises as his homestead after this sale, there is not the slightest ground exhibited in the record for impeaching its validity, or to warrant the subsequent claim of the property by Nickelson adversely to the purchaser at this sale. And evidently he ultimately abandoned all claim to it when, by permission of the Probate Court, he purchased the property, from the purchaser at the trust sale, for his daughter. If he could have impeached the sale under the trust deed to Fenner previous to this purchase, he certainly estopped himself thereby from asserting title to

it against his daughter and those claiming under her title. And we do not understand, that, on the trial in the court below, Nickelson claimed or pretended to have any title to the premises whatever, except that acquired from his daughter, by the instrument exhibited in the statement of facts, dated March 8, 1872, and her and her husband's deed of the 26th of the same month. Without pausing to consider whether the first of these instruments is supported by any valid consideration, or can be regarded as justly entitled to any weight or consideration in and of itself, it will suffice to say, that giving to it the most favorable consideration for Nickelson of which it will possibly admit, still there can be no pretense that it vests, or was intended to vest, any right or title to the premises here in controversy in him, prior to his daughter's marriage. The right or title intended to be secured to him by this instrument was entirely dependent upon her marriage. If it can be held to vest an equitable title or interest in the premises in Nickelson, evidently it did not do so until his daughter's marriage. But by her marriage she ceased to be a constituent of his family. It is, therefore, beyond dispute, unless there was some other constituent member of the family besides the father and daughter at the date of the marriage, or the property, subsequent to its conveyance by his daughter, and prior to its sale, became the homestead of a family of which Nickelson was a constituent, it was not exempt from sale for the payment of his debts.

Can it be said, on the facts exhibited in the record, that Nickelson, when he acquired the property, or at any time subsequent thereto, prior to its sale under the execution, was either the head or a constituent member of a family, in the sense contemplated in the Constitution? It is a maxim, that a man must be just before he is generous. If so, certainly he cannot exempt his property from liability for his debts by voluntarily taking upon himself, for some temporary or indefinite period, the support and maintenance of persons having no legal claim upon him, though prompted to do so by

34

the strongest motives of gratitude or affection; nor does the mere temporary and indefinite union of persons in one household, "directing their attention to a common object, the promotion of their mutual interest and social happiness," constitute a family, within the meaning of the Constitution. Nor can it be said, that because a party may, in consideration of the services of hirelings, or of persons permissively residing with him, pay them wages, or contribute in whole or in part to their support, there is a family, as contemplated in the Constitution. But unless parties occupying some such relation as indicated above constitute a family, a portion of the property of the head whereof is exempt from forced sale by the Constitution, (and we are clearly of the opinion they do not,) appellee evidently was not entitled to the immunity given him by the verdict and judgment; and the charge of the court, which obviously led to this result, was, as we think, unquestionably erroneous.

In disposing of this case, it is not necessary for us to say, that only a family composed of the husband and wife, or one of them and minor children, or unmarried daughters, or presumptive heirs, or others for whose support the head of the family is legally bound to provide, can claim the benefit of the exemption of the homestead from forced sale, or to lay down fixed and definite rules, by which it can be determined in every case what character of persons living together, under the peculiar circumstances of each case, will constitute a family within the meaning of the Constitution; and we have, therefore, made no effort to do so. When a case is presented to us requiring it, it will then be time enough for us to attempt the task, the performance of which evidently cannot be free from difficulty.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.